NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250185-U

NO. 4-25-0185

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| ANTHONY DEMTRISE FOWLER, | ) | No. 05CF212 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed an order denying defendant's postconviction actual innocence claim after a third-stage hearing where the trial court's findings were not manifestly erroneous. The appellate court also affirmed an order denying defendant's other postconviction claims as untimely where defendant received reasonable assistance of counsel.

¶ 2     In 2007, a Peoria County jury found defendant, Anthony Demtrise Fowler, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) in connection with the death of Vernell McLain. The jury also found that defendant personally discharged a firearm during the commission of the offense, proximately causing McLain's death. The trial court sentenced defendant to natural life in prison. The appellate court affirmed defendant's conviction on direct appeal. *People v. Fowler*, 394 Ill. App. 3d 1119 (2009) (table) (unpublished order under Supreme Court Rule 23). In 2019, defendant filed a postconviction petition, alleging actual innocence and ineffective assistance of counsel. In 2025, the trial court denied defendant's actual innocence claim after a

third-stage evidentiary hearing and denied the other claims as untimely at the second stage. Defendant appeals, arguing that (1) the evidence in support of his actual innocence claim warranted a new trial and (2) postconviction counsel provided unreasonable assistance. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. The Trial

¶ 5        The trial evidence showed that in the early morning hours of January 14, 2005, Jestina Jordan and her fiancé, McLain, went to a nightclub in Peoria, Illinois, known as the Underground Nightclub. The club's entrance was located in Niagara Alley, which connected with Adams Street on one side and Jefferson Street on the other. Shortly after the club closed at 4 a.m., Jordan and McLain exited. As they walked through Niagara Alley, McLain exchanged words with somebody who was driving defendant's car. That individual got out of the car and shot McLain once in the chest before driving away from the scene. McLain died at a hospital later that morning. The police never found the gun used in the shooting.

¶ 6        The State's theory was that defendant was the shooter. The defense's theory was that someone known to defendant only as "Adrian" was the shooter.

¶ 7                          1. *The State's Case in Chief*

¶ 8                            a. Jordan's Testimony

¶ 9        Jordan testified that she went to the Underground Nightclub with McLain around 1 or 2 a.m. on January 14, 2005. At one point, Jordan got into an argument with McLain because she wanted to go home and he did not. Jordan then went home briefly but returned to the club around 3 a.m. She claimed that she had two shots of vodka at the club but did not get drunk. (A police officer who spoke with Jordan shortly after the shooting testified that she had alcohol on her breath.) McLain, on the other hand, was intoxicated.

¶ 10 According to Jordan, after the club closed, she and McLain walked together in Niagara Alley toward her car, which was parked on Jefferson Steet. A blackish-gray, older model, two-door Buick with Illinois license plates pulled in and stopped at the end of the alley. There was only one person in that car, whom Jordan had never seen before. Jordan described that person as a heavyset African-American male with braids and big eyes.

¶ 11 McLain became upset upon perceiving that the person in the car was looking at Jordan. McLain broke away from Jordan and approached the car. Jordan heard McLain ask the person in the car why he was looking at Jordan, whether he knew her, and why he had a gun in the car. Jordan then walked up and saw that the person had a gun in his car. Jordan stepped in front of McLain and encouraged him to leave.

¶ 12 The person got out of the car, and Jordan saw he was dressed all in black. Jordan stood between the men, facing McLain. She again tried to defuse the situation by encouraging McLain to leave. She also turned around and told the other person not to mind McLain because he had been drinking.

¶ 13 When Jordan turned back toward McLain, she heard him say: " 'If you gonna go ahead and shoot, shoot.' " As Jordan was facing McLain, she saw a gun in the right hand of the shooter as he reached around her by coming over her shoulder and shot McLain once in the chest. The shooter got in his car and sped off down the alley.

¶ 14 Jordan did not see anybody else in the alley at the time of the shooting. However, she also said that she would not have noticed if someone else was around, as she was too busy looking at McLain and what was going on. Jordan tried to help McLain walk to their car before laying him down at the corner and screaming for help. According to Jordan, Antquint Cox (known to her as "Chronic") subsequently pulled up in a white truck and called the police.

¶ 15        Jordan later spoke with the police at the scene and provided a description of both the shooter and his car. Specifically, Jordan, who was 5 feet, 11 inches tall, described the shooter to the police as five feet, six inches tall, 200 pounds, and having braids down to his shoulders. Jordan went to the police station for further interviews while McLain was taken to a hospital, where he died later that morning. Jordan testified that she never had contact with Cox again after the morning of the shooting.

¶ 16        Jordan testified that she identified defendant as the shooter from both a photographic lineup and an in-person lineup. (In the in-person lineup, defendant was listed as five feet, eight inches tall and 175 pounds; a police witness testified that defendant had braided hair down to about his shoulders, and photographs in the record appear to confirm that.) Jordan knew 3 of the 11 people who appeared in the photographic lineup, and defendant was the only person in the in-person lineup who was also in the photographs Jordan saw. Nevertheless, Jordan testified she was certain of her identification of defendant as the shooter. Jordan again identified defendant as the shooter in court, declaring: "I will never forget his face till the day I die."

¶ 17                            b. Cox's Testimony

¶ 18        Police officers encountered Cox near Niagara Alley shortly after they arrived at the scene on January 14, 2005. Cox reported that he had no relevant information about the shooting. In July 2006, Cox was sentenced to 20 years in prison in connection with a federal drug case. Sometime in 2007, he contacted federal prosecutors and told them he had information about McLain's murder. Although Cox had not received any promises as of the time of defendant's trial, Cox acknowledged hoping that federal authorities might reduce his sentence in consideration of his cooperation. Cox denied reviewing the police reports or speaking with Jordan about this case.

¶ 19        Cox testified that he arrived at the Underground Nightclub around 1 a.m. on January

14, 2005. He went there with his friend, Sidney Thompson, in a Ford Expedition. There were warrants out for Cox's arrest at that time, and, admittedly, he had cocaine and crack cocaine in his vehicle to sell.

¶ 20       Cox testified that he left the club alone about 30 minutes before it closed. He circled the block a few times looking for Thompson. Around 4 a.m., Cox pulled his car partially into Niagara Alley near Jefferson Street and noticed there were a few cars around. He saw defendant (whom he referred to as "Spank") exchanging words with McLain while Jordan held McLain back. Cox said he had known defendant since 1998, was good friends with McLain, and was acquainted with Jordan.

¶ 21       Cox claimed that his vehicle's lights were on and he was only three or four feet away from defendant, Jordan, and McLain. Cox saw defendant pull out a black handgun and Jordan covering up McLain. Cox quickly reversed and drove away, barely avoiding hitting a car behind him. Cox heard a gunshot as he was backing out, but he did not see a shot fired.

¶ 22       Cox then drove around and picked up Thompson. The two of them drove back by Niagara Alley and saw McLain on the ground and Jordan leaning over him. Thompson took over driving while Cox called 911 and walked over to McLain and Jordan. Cox later saw the police arrive and block off Jefferson Street. He also saw that Thompson had pulled his vehicle into the alley. Cox and Thompson attempted to drive away from the scene via Adams Street, but the police blocked their path. Cox and Thompson then disposed of their drugs in a dumpster in the alley before encountering the police.

¶ 23                                   c. Jennifer Smith

¶ 24       Jennifer Smith testified that she was at the Underground Nightclub on January 14, 2005, with her friend, Tracy Williams. Williams at some point had dated defendant, whom Smith

knew as "Spank." Smith saw defendant inside the club that morning. Smith and Williams left the club around 4:05 or 4:10 a.m., when people cleared out. Smith claimed she was not intoxicated that morning, as she only had one drink. She did not know who McLain was, and she denied telling the police that McLain was still in the club when she left.

¶ 25    Smith testified that she and Williams walked toward another bar. On the way, Smith saw defendant pull into the alley in a two-door vehicle she had seen him use previously. She testified that People's exhibits Nos. 11 and 12 were photographs of that vehicle. (Other trial evidence established that defendant owned the 1986 Buick Riviera depicted in those two exhibits.) Smith was almost positive that there were four people in defendant's vehicle, but she did not know who the other three were.

¶ 26    Defendant, who had his hair straight back in braids down his neck, stopped and spoke with Smith for a minute or two. Smith and Williams then proceeded toward their destination, heading across Jefferson Street, as defendant drove down the alley toward Adams Street. Smith did not see a Ford Exhibition anywhere in the alley. Smith and Williams had just crossed Jefferson Street when Smith heard a gunshot. Williams then got on the phone and called defendant. Smith and Williams proceeded to the next bar.

¶ 27    Smith testified that the police contacted her about the shooting in February 2005. On February 20, 2005, she identified defendant and a person named "Quincy" (whom she knew as "Q") from photographs. On March 2, 2005, Smith identified defendant from an in-person lineup. The next day, she identified defendant's vehicle in a parking lot.

¶ 28    According to Smith, between January 14 and March 1, 2005, she heard brief conversations between defendant and Williams concerning detectives coming to question her and Williams. Smith acknowledged that she was convicted of two felonies in 2004 for unlawful use of

a credit card.

¶ 29                              d. David Tucker's Testimony

¶ 30         David Tucker testified that he worked at a parking garage overlooking Niagara Alley. On the morning of January 14, 2005, he noticed an SUV pull partially into the alley. He discerned that some people were saying or yelling something, but he could not hear them. The SUV then backed up quickly and exited the alley onto Jefferson Street. A few minutes later, Tucker heard a gunshot when he was in a corner of the parking deck. A few seconds after that, Tucker looked onto Jefferson Street and did not see anybody running there. Tucker then ran to a different location, looked down the alley, and noticed some taillights at the end of the alley at Adams Street. Tucker also saw McLain and Jordan. Tucker ran downstairs from the parking garage, knocked on the door of a business to request that someone call the authorities, and proceeded to the location where Jordan was attempting to revive McLain.

¶ 31                              2. *Defendant's Case in Chief*

¶ 32                              a. Police Witnesses to Impeach Jordan and Smith

¶ 33         Defendant presented testimony from police officers to impeach Jordan and Smith.

¶ 34         As mentioned above, Jordan testified that she saw a gun in defendant's car before he exited his car. However, a police officer who interviewed Jordan at the scene of the shooting testified that his perception from speaking with her was that she became aware the shooter had a gun when he got out of his car with a gun in his hand. This officer also testified that Jordan did not tell him that the shooter shot around her or over her. Rather, Jordan said the shooter walked right up to McLain, placed a gun on his chest, and shot him.

¶ 35         A different police officer who interviewed Jordan around 7:30 a.m. on January 14, 2005, at the police station testified that Jordan told him she and McLain did not argue at the club.

Jordan also failed to tell the officer during this interview that she had left the club to go home before returning. According to the officer, during another interview at around 5 p.m. that same day, Jordan again denied leaving the club. The officer then spoke with Jordan's mother, who told him that Jordan had left the club. At that point, Jordan admitted to the officer that she had left the club briefly because she and McLain had a fight.

¶ 36 A police officer testified that he interviewed Smith on February 5, 2005, at her home. During that interview, Smith admitted that she was intoxicated while at the Underground Nightclub. Smith also told the officer that even though she left the club after it closed, she was aware that McLain was still inside. Furthermore, Smith told the officer that she saw defendant and "Q" stopped at the entrance to the alley but that she did not speak with either of them at that time. Smith never mentioned to the officer that she saw four people in defendant's vehicle. This officer also testified that Smith provided conflicting information during her various interviews as to whether "Q" was in the club on the night of the shooting.

¶ 37                                    b. Jarrod Christophel's Testimony

¶ 38 Jarrod Christophel was an employee of the Underground Nightclub. Around closing time on January 14, 2005, he heard a commotion coming from the ladies' restroom. He checked inside and saw a woman on the ground and a man trying to pick her up. Christophel's impression was that the woman was inebriated and not "about her wits." Christophel asked the two people to leave the club, and they did.

¶ 39 As Christophel was cleaning, somebody entered the club and told him there was a shooting outside. Christophel went into the alley and saw a man on the ground in distress and a frantic woman sitting beside him. These were the two people Christophel had seen in the restroom.

¶ 40                                    c. Defendant's Testimony

¶ 41 Defendant testified that he was five feet, eight inches tall and had gained a lot of weight since the shooting. He acknowledged he was a convicted felon and had been sentenced to 50 months in prison in 2001. (The State later introduced evidence that this conviction was for distribution of crack cocaine.)

¶ 42 According to defendant, around 2 a.m. on January 14, 2005, he went to the Underground Nightclub with a group of friends, including "Q" and "Adrian." Defendant did not know Adrian's last name but at one point testified he thought it was "Jones." Although defendant and Adrian first met in 2000, they had only seen each other four times before this morning.

¶ 43 Defendant testified that he was wearing blue and white clothing at the club. His group rented out a room and hung out there. Defendant was unfamiliar with McLain and Jordan and did not know whether he saw them in the club that morning. Defendant left the club with Adrian at 4 a.m. He hopped in the back of a friend's pickup truck that was parked in the alley for about 10 minutes. Defendant and Adrian then walked to defendant's car, which was parked behind the club. Defendant acknowledged that this was the car identified in photographs by the State's witnesses.

¶ 44 Defendant testified that he was under the influence of alcohol and Adrian was not, so Adrian drove defendant's car. Adrian stopped at a traffic light at Main Street and Jefferson, where he and defendant encountered Williams and Smith walking on the sidewalk. Defendant knew Williams and Smith through "Q," who was dating Williams. Defendant waved to Williams and Smith. After the light turned green, Adrian pulled halfway into Niagara Alley.

¶ 45 Defendant saw a man and a woman walking down the alley. Adrian pulled up, lowered the car window, and asked the woman, " 'What's up?' " The woman responded to Adrian, " 'What's up?' " She then took her arm off the man she was walking with, "f[ell] off in the car,"

- 9 -

and told Adrian to get out of the car and "holler." The woman also asked Adrian who defendant was, and Adrian responded, " 'This is my friend, this is my guy Spank, he cool.' " This discussion gave defendant the impression that Adrian knew the woman. Adrian then got out of the car and walked behind it to talk. Defendant raised his window and put the music back on.

¶ 46    Defendant could not hear what was being said behind his car. When he glanced back a couple of times, he saw that the woman was standing beside Adrian and the other man was in front of them. It seemed to defendant that the group was arguing, but defendant did not know what they were arguing about. Defendant heard a gunshot as he was playing with the screen for the music in the car. He looked back and saw the unknown man walking backward and pointing his finger. It did not seem to defendant like that man had been shot.

¶ 47    Adrian then walked back to the car. Defendant asked him whether somebody had shot at the car. Adrian responded that defendant was drunk. Adrian put the music back on and drove away on Adams Street. Adrian dropped defendant off where he was headed for the morning but kept defendant's car. At some point, defendant received calls informing him that somebody had been shot in the alley.

¶ 48    After defendant woke up later on the morning of January 14, 2005, Adrian picked him up again. They went to an apartment complex, at which point Adrian opened the car's console and showed defendant a gun. Defendant was upset and told Adrian not to bring a gun into the car. Defendant started to think that Adrian was the shooter.

¶ 49    On cross-examination, defendant acknowledged that he never told the police anything about Adrian when he spoke with them on March 1, 2005. Defendant spoke with the police again on March 3, 2005, when he knew he was going to be charged with murder imminently. Defendant then told the police his "theory" that Adrian shot McLain. Defendant also informed the

police that Adrian was incarcerated in Galesburg, Illinois, and would be released the next day.

¶ 50        On cross-examination, the State also questioned defendant about whether he made numerous statements to the police during his interviews. Defendant generally denied making statements that contradicted his testimony. As one example, he denied telling the police that he knew McLain. Rather, defendant testified that he told the police about a different person from Chicago, Illinois, named "Verdell." However, defendant admitted that he told the police he knew where the murder weapon was and would not reveal that information until he knew what the police could do for him.

¶ 51                    3. *The State's Rebuttal Evidence*

¶ 52        In rebuttal, Officer Chad Oberle of the Peoria Police Department testified about defendant's inconsistent statements and omissions during his interviews. When Oberle interviewed defendant on March 1, 2005, defendant stated that a friend introduced him to McLain inside the club on January 14, 2005. According to Oberle, defendant did not seem to be confused on that point and never said that the person he was talking about was from Chicago. During this interview, defendant also claimed that he was exiting the alley onto Adams Street in a green Dodge Intrepid when he heard a gunshot. Defendant said there were other people in that car with him.

¶ 53        Oberle further testified that when he interviewed defendant again on March 3, 2005, defendant said he was riding in Adrian's green Intrepid when they pulled into an alley and saw "Vernell and his girlfriend." Defendant told Oberle that Adrian, McLain, and McLain's girlfriend were standing next to the driver's side of the vehicle, between the front and back doors. Defendant said that he was never able to see what McLain's girlfriend looked like and that she never looked to see what he looked like.

¶ 54        Oberle further testified that defendant informed him that the "Adrian" he was

referencing was jailed in Galesburg and would be released on March 4, 2005. Oberle then went to the Knox County jail in Galesburg and interviewed a person named Adrian Terrell Johnson, who was scheduled to be released on March 4, 2005. Oberle noticed that Johnson was bald. In court, Oberle identified Johnson's photographs from jail intake records. Those intake records described Johnson as six feet, three inches tall, 190 pounds, and bald.

¶ 55                             4. *Verdict and Sentencing*

¶ 56          The jury found defendant guilty of first degree murder. The trial court sentenced him to life in prison.

¶ 57                             B. Direct Appeal

¶ 58          On direct appeal, defendant argued that the prosecutor committed misconduct during closing arguments and the trial court abused its discretion in imposing the sentence. The appellate court affirmed the judgment. *Fowler*, slip order at 1. Although the court determined that the prosecutor made remarks that were "inappropriate and incorrect," the court asserted that it could "not conclude that the verdict would have been different but for the remarks." *Fowler*, slip order at 18.

¶ 59          On November 25, 2009, our supreme court denied defendant's petition for leave to appeal. *People v. Fowler*, No. 108878 (Ill. Nov. 25, 2009). Defendant did not file a petition for *certiorari* with the United States Supreme Court. Thus, other than a claim of actual innocence, for which there is no deadline, defendant's due date to file a postconviction petition was August 23, 2010. See 725 ILCS 5/122-1(c) (West 2008) (establishing that a defendant must file a postconviction petition within six months after the due date for a *certiorari* petition, "unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence"); S. Ct. R. 13(1) (eff. May 2, 2005) (federal rule providing that a petition for *certiorari* is due 90 days

after the state court of last resort denies discretionary review).

¶ 60    C. Defendant's Activities Before Filing a Postconviction Petition

¶ 61    On August 9, 2010, the clerk of the circuit court file stamped a *pro se* motion in which defendant requested a four-to-six-month extension to file a postconviction petition. Defendant alleged that his prison facility was on extended lockdown, so he did not have access to the law library. He also represented that he could not read, write, or spell well and would have to learn the law. Defendant did not notice this motion for a hearing.

¶ 62    In December 2018, defendant wrote a letter to the clerk of the circuit court, requesting information about the status of his 2010 motion. Defendant sent a follow-up letter in March 2019. The clerk responded that the 2010 motion was filed but apparently never docketed and no action was taken on it.

¶ 63    Meanwhile, in August 2018, defendant filed a *pro se* pleading that essentially sought to vacate his conviction pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)) because an attorney who represented him before trial also represented a prosecution witness. The trial court denied that petition in October 2018.

¶ 64    D. Defendant's *Pro Se* Postconviction Petition

¶ 65    In October 2019, defendant filed a *pro se* postconviction petition. Pertinent to this appeal, defendant alleged (1) actual innocence based on newly discovered evidence, (2) ineffective assistance of counsel based on failures to inform him of the correct sentencing range and a pretrial plea offer made by the State, and (3) ineffective assistance of counsel for failing to recognize that his criminal history was misrepresented at the sentencing hearing.

¶ 66    1. *The Ineffective Assistance Claims*

¶ 67    The substance of defendant's ineffective assistance claims is not at issue on appeal.

- 13 -

However, the timeliness of those claims is. Relevant to his absence of culpable negligence, defendant alleged in paragraph A.8 of his petition that he exhibited "due diligence" in filing the petition. In paragraph A.9, defendant explained:

> "Reason for the late post-conviction petition is because of the petitioner's illiteracy not only to the law but as well as his education. He never past [*sic*] the 8th grade. He eventually was past [*sic*] on due to his age being to [*sic*] old to be in the 8th grade. His entire time in school he was in special education classes. He was medicated as a child to try and assist with his learning disability and behavioral disorder. During his incarceration he scored a 4.6, 3.6, and a 10.6 on his pre-GED tests, which was very low scores. In his defense, he did file a motion for continuance before his post-conviction deadline was up. Which should show that the defendant was not being neglectful but did not know how to read or write that well at that time. It took almost 10 years to not only learn the law and what his constitutional rights were. He practiced due diligence to figure out how to properly file a post-conviction petition and how to use case laws properly. The defendant just received some 'newly discovered evidence', to go with this actual innocence claim. If Defendant had filed earlier, he would not have had the new evidence in this case. For these reasons is why the defendant is late to file. Defendant was not trying to be neglectful in any way."

Defendant also attached his own affidavits to his petition. In one of them, he criticized an attorney who represented him before trial for failing to investigate his IQ, school records, and medical records. Defendant averred that he was on "Rittlen and Ataraul [*sic*]" growing up, was enrolled in special education classes due to a learning disability and behavioral disorder, and only passed the

- 14 -

eighth grade when he aged out.

¶ 68                  2. *The Actual Innocence Claim*

¶ 69       Defendant's actual innocence claim was based on newly discovered information from Joseph Horton. In support of this claim, defendant attached an affidavit signed by Horton on August 28, 2019, averring as follows:

> "On 8-23-19 I ran in to a friend of mine, whom I haven't seen for many years, that at the time I only new as Spank in Western Illinois, Correctional Center in Mount Sterling IL, where I was just passing through. But I ran into Spank and who I now know as Anthony Fowler. But I asked him[,] what was he doing in jail[?] And he said he got a life sentice for a murder that he didn't even do. And I asked him for who's murder, and he told me he don't talk about his case[.] So I changed the subject and asked him about our mutual friend Adrian and Spank said that Adrian was on the street's somewhere[.] And then I asked him, did Adrian ever get caught for shooting Verrnell at the club that night[?] And Spank said no they locked him up and charged him with the Verrnell shooting and they never charged Adrian with nothing, and that Verrnell McLain died that night[.] And I was sad to hear such bad news like that about Verrnell[.] And I saw him get shot and I probly could had did something to help him or help with the case so a innocent person would not be sitting in jail right now[.] So I will do my part starting right now... On or about Jan 14, 2005, I arived at the Under Ground Night Club and bumped into Adrian & Spank at the club[.] [T]he two of them were in the ViP area and we all caught up, I have not seen Adrian or Spank in over 6 yrs[.] So we talked and as the club closed we all headed out, it had to be around 4:20 a.m[.] And Adrian said he and Spank

- 15 -

was going to grab Spank's car so I waited in the alley way by the entrance of the club in the alley in the Niagra alley way when I saw a dark color two door buick riviera with Adrian behind the wheel and Spank in the passenger seat talking to Adrian, and then I saw Adrian get out and walk up to Verrnell and just shoot him and I don't know why[.] I don't know where he shot him[.] All I saw was he shot him[,] put the gun in his pocket[,] and drive right past me[.] And then I saw Verrnell run[.] And I then ran to my car and went back to Decator, IL, and then I moved back to Chicago a little while later, but I did not know that Vernell died[.] I wish I would have stayed there to try and help but I do know that I am 100% sure that Anthony Fowler A.K.A. Spank did not shoot Verrnell McLain that day at the under ground Night club in Niagra alley way that night because I was standing right in the middle of the alley way along with other people as well[.] And I will testify if called!"

¶ 70          E. Summary Dismissal of Defendant's Postconviction Petition and Appeal

¶ 71          The trial court summarily dismissed defendant's postconviction petition, deeming it frivolous and patently without merit. The appellate court reversed that order, determining that defendant satisfied the standard for alleging an actual innocence claim at the first stage of postconviction proceedings. *People v. Fowler*, 2022 IL App (3d) 200034-U, ¶¶ 14-18, 21. Because partial dismissals are not permitted at the first stage, the appellate court remanded the matter for further proceedings on the entire petition without addressing defendant's other claims. *Fowler*, 2022 IL App (3d) 200034-U, ¶ 19.

¶ 72          F. The Second Amended Postconviction Petition and Counsel's
                        Rule 651(c) Certification

¶ 73          On remand, defendant retained private counsel. In April 2024, counsel filed a first

- 16 -

amended postconviction petition on defendant's behalf. Counsel filed a second amended petition in June 2024. In the second amended petition, counsel made arguments in support of defendant's actual innocence claim and ineffective assistance claims. Counsel did not add any new allegations regarding defendant's lack of culpable negligence for the late presentation of the ineffective assistance claims. However, counsel wrote that "Petitioner includes herein as though set forth verbatim, paragraph A of his *pro se* petition, regarding the historical facts of the proceedings starting with the jury verdict." (As previously mentioned, paragraph A.8 of the *pro se* petition alleged that defendant acted diligently in filing the petition, and A.9 outlined the reasons for the delay.) Counsel further indicated that defendant was submitting the affidavits and exhibits "previously submitted in the *pro-se* petition."

¶ 74        Postconviction counsel filed the following certification pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017):

> "1. I have been retained to represent [defendant] in his post-conviction petition.
>
> 2. I have reviewed the relevant orders, including but not limited to the order in 2022 IL App (3d) 200034-U.
>
> 3. I have reviewed the *pro-se* petition which was dismissed by the trial court and was the subject of the above order.
>
> 4. I have read and reviewed the lengthy transcripts provided by [defendant.]
>
> 5. I have consulted with the [defendant] principally by letter on multiple occasions.
>
> 6. I have included in said petition all three fundamental claims of [defendant], and added a claim of conflict of interest."

¶ 75        G. The State's Motion to Dismiss and the Parties' Agreement
                        Regarding How to Proceed

¶ 76        In November 2024, the State filed a motion to dismiss the second amended postconviction petition, arguing that the claims, other than actual innocence, were untimely. At a status hearing on November 8, 2024, an assistant state's attorney acknowledged that the actual innocence claim required a third-stage evidentiary hearing. However, he maintained that defendant's other claims were time-barred. The assistant state's attorney asserted that he believed the State needed to raise the timeliness issue at the second stage of the proceedings, "even if maybe just to argue it when we come back for a third-stage" hearing. He added that he understood "the overall rule that the petition can't be parsed out." Defendant's counsel agreed that "it has to go" to the third stage. Counsel also stated, "[T]he appellate court opinion seems pretty straightforward on that and there's no separating the petitions." The court said, "[W]e'll set this for a third-stage hearing," although doing so would not prevent the State from raising the issue of timeliness at the third stage. The parties indicated they were both agreeable to that procedure.

¶ 77        On January 31, 2025, the matter returned for the scheduled hearing. The trial court first requested clarification from the parties "on how it comes to pass that we're at a third-stage" hearing. The assistant state's attorney reiterated that defendant's actual innocence claim raised issues of credibility that required a third-stage evidentiary hearing. The assistant state's attorney added that at the second stage of proceedings, he filed "a motion to dismiss just to preserve my argument that the other allegations are untimely." Defendant's counsel indicated that he agreed with that assessment of the procedure. The court asked the parties: "Then how do you want to handle the motion to dismiss? Do you want me to just rule on everything?" The assistant state's attorney responded, "Judge, I think my thought is I would just argue it with the arguments I have

- 18 -

for third-stage and then all together." The court asked defendant's counsel whether he was okay with that approach, and counsel said he was.

¶ 78                    H. The Evidence at the Postconviction Hearing

¶ 79        Defendant did not introduce any evidence in support of his claim that his criminal history was misrepresented at his sentencing hearing. However, defendant testified on his own behalf in support of the claim regarding the forgone plea offer. In brief summary, defendant claimed that his trial counsel (1) misinformed him that his sentencing range was 20 to 60 years in prison and (2) failed to advise him until after he was sentenced to life in prison that the State had offered a plea deal that would have required him to serve only 23 years. Addressing the timeliness of his postconviction petition, defendant testified that he requested an extension of time in 2010 but "never heard back from them." Defendant also introduced into evidence the 2019 note from the clerk of the circuit court, which indicated that defendant's 2010 motion had been filed but apparently never docketed or acted upon.

¶ 80        With respect to his claim of actual innocence, defendant testified that he knew Horton before January 14, 2005, "from the streets" and "run[ning] up in the same neighborhoods." Although they were close friends and would hang out, there were sometimes five or six years at a time when they did not see each other. After his conviction, and at a point when defendant had not seen Horton in 14 years, they came across each other in prison. According to defendant, Horton asked him whether Adrian was ever imprisoned in connection with the January 14, 2005, shooting. When defendant explained that he was imprisoned for the shooting instead, Horton volunteered to prepare an affidavit for defendant because Horton knew that defendant was not the shooter.

¶ 81        Defendant acknowledged that he hung out with Horton at the Underground Nightclub on the morning of the shooting, that he provided Horton's name to the police long ago,

and that Horton's name appeared "in the original police report." Nevertheless, defendant was unaware back then that Horton witnessed anything relevant to the shooting. Defendant claimed that he tried to reach out to Horton at some unspecified time through friends, but nobody had seen him. Defendant said he was unable to contact Horton until they met again in prison.

¶ 82    Horton also testified on defendant's behalf, as follows. Horton currently lived in Chicago with his wife and children, and he worked as a bouncer at a nightclub. In January 2005, he lived in Chicago but was visiting family in Peoria. On January 14, 2005, he was at the nightclub near where the shooting occurred. He could not recall the name of the club, as it was so long ago and he only went there once. He drank a sip of alcohol that night and was not drunk. He was looking for someone he knew only as "Adrian" to pick him up, just to drive around. Although Horton said he "barely knew" Adrian, he explained that they had met previously. Horton described Adrian as being five feet, six inches or five feet, seven inches tall and skinny.

¶ 83    Horton testified that he happened to see a woman he knew as "Neenee" before the shooting, and she offered to let him smoke marijuana in her car. Horton then left the nightclub around 2 or 3 a.m., though he did not remember the exact time. He got in the passenger's seat of Neenee's car, and she got in the driver's seat. The two of them ended up parked in an alley, the name of which Horton could not remember.

¶ 84    According to Horton, he was about to smoke marijuana when he saw Adrian drive past him in a black car. Horton maintained that he did not see defendant in that car. About 60 feet in front of him, he saw Adrian get out of the car. Horton then heard a gunshot. He said that he did not see the flash of a weapon, though he saw sparks coming from the gun. He did not know what kind of gun Adrian had.

¶ 85    After the shooting, Neenee made a U-turn in the alley and backed up. They drove

back to the location where Horton was staying, and he returned to Chicago the next day. Horton further testified that he met defendant again years later in prison and wrote an affidavit for him.

¶ 86    The State presented no new testimony. However, the State asked the trial court to take judicial notice of the trial transcripts. The State also relied on certain exhibits that had been admitted at trial, including (1) the exhibits attendant to Smith and Jordan identifying defendant from lineups and (2) jail intake documents indicating that Adrian Terrell Johnson was six feet, three inches tall, 190 pounds, and bald.

¶ 87                            I. The Parties' Arguments

¶ 88    Postconviction counsel argued that defendant's claims regarding actual innocence and the forgone plea offer were meritorious. However, counsel did not address the timeliness of the initial postconviction petition or argue that defendant lacked culpable negligence for the delay in filing it.

¶ 89    The assistant state's attorney then argued that both of defendant's claims lacked substantive merit. However, he also maintained that the forgone plea offer claim was "legally forfeited" and "legally barred" because defendant admitted in his testimony that he learned of the plea offer before his direct appeal.

¶ 90    In his rebuttal argument, postconviction counsel briefly addressed the State's point about the forgone plea offer claim being forfeited:

> "As to it being waived, I refer to the fact that he learned after the trial, after all the motions have been filed, by not doing anything at that stage, that's not the law. That's not the law at all. This is a valid, valid point, Your Honor. And I'd ask that Your Honor give serious consideration to granting the petition."

The trial court took the matter under advisement.

¶ 91                         J. The Trial Court's Ruling and the Notice of Appeal

¶ 92          On February 6, 2025, the trial court entered an order denying defendant's postconviction petition. The court clarified that on January 31, 2025, the court had held a second-stage hearing on the legal issues raised in the State's motion to dismiss and a third-stage hearing on defendant's actual innocence claim.

¶ 93          With respect to the actual innocence claim, the trial court indicated that it had the opportunity "to view the credibility, personality and demeanor" of both defendant and Horton during their testimony. The court also "reviewed the entirety of the evidence, file, pleadings, appellate history and arguments." In the court's view, Horton's testimony was "relevant but not nearly enough to meet the Defendant's burden at this stage of the proceeding." The court explained: "Mr. Horton's initial involvement with these postconviction proceedings (the Defendant bumped into him in prison in August 2019) coupled with Mr. Horton's demeanor and less than clear recall of the facts of the case and the contents of *his* sworn affidavit fall short." (Emphasis in original.) The court found that Horton's and defendant's credibility was "further strained in that [defendant] was unaware of Mr. Horton as a witness to the shooting." Additionally, the court determined that Horton's testimony could not overcome the "overwhelming evidence against" defendant. To that end, the court believed that the Third District had "impliedly concluded this was not a close case" in the course of resolving defendant's claim about prosecutorial misconduct on direct appeal. Ultimately, the court found that defendant had not shown by a preponderance of the evidence that Horton's testimony was of such a conclusive character that it would probably change the outcome on retrial.

¶ 94          The trial court found that the State's arguments with respect to the remaining claims were "well taken." Specifically, the court found that "the allegations of ineffective assistance and

what transpired at the sentencing hearing are untimely."

¶ 95 Defendant filed a timely notice of appeal from this order.

¶ 96                                     II. ANALYSIS

¶ 97 On appeal, defendant argues that the trial court should have ordered a new trial based on Horton's testimony at the third-stage evidentiary hearing. Defendant also contends that he received unreasonable assistance of counsel in connection with his ineffective assistance claims.

¶ 98         A. Whether the Order Denying Defendant's Actual Innocence Claim
              At the Third Stage of Proceedings Was Manifestly Erroneous

¶ 99 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)) "provides a means for individuals serving criminal sentences to assert that their convictions resulted from substantial denials of their constitutional rights." *People v. Hilliard*, 2023 IL 128186, ¶ 18. There are three stages of postconviction proceedings. At the first stage, the court reviews the petition independently to determine whether it is " 'frivolous or is patently without merit.' " *Hilliard*, 2023 IL 128186, ¶ 19 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2018)). If the court does not summarily dismiss the petition pursuant to this standard, the matter proceeds to the second stage. *Hilliard*, 2023 IL 128186, ¶ 19. At that point, the court may appoint counsel for the defendant, and the State may answer the petition or move to dismiss it. *People v. Domagala*, 2013 IL 113688, ¶ 33. If the defendant's petition and any accompanying documentation make a substantial showing of a constitutional violation, the matter proceeds to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶¶ 33-34. At that evidentiary hearing, the trial court "serves as the fact finder" by assessing witness credibility, weighing testimony, resolving evidentiary conflicts, and ultimately determining whether the defendant is entitled to postconviction relief. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 100 Here, the trial court denied defendant's actual innocence claim following a

third-stage evidentiary hearing. We may not reverse that decision unless it is manifestly erroneous, which means that the error is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). "Such deference is due because trial courts acting as fact-finders rely heavily on the demeanor and paralanguage of the witnesses to assess their credibility—factors unavailable to a reviewing court, which has at its disposal only the transcript of a cold record." *People v. House*, 2023 IL App (4th) 220891, ¶ 89. "When evaluating a circuit court's assessment of witness credibility under the manifest error standard, the reviewing court considers whether the credibility assessment was reasonable." *People v. Masters*, 2024 IL App (4th) 230370, ¶ 54. "Thus, if there could be a reasonable difference of opinion whether a witness should be believed, our duty is to defer to the circuit court." *Masters*, 2024 IL App (4th) 230370, ¶ 54.

¶ 101     A defendant has a due process right to present a claim of actual innocence in a postconviction petition based on newly discovered evidence. *Ortiz*, 235 Ill. 2d at 331. However, the standard for obtaining a new trial from such claim is "extraordinarily difficult to meet." *People v. Coleman*, 2013 IL 113307, ¶ 94. As our supreme court has explained:

"Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a

different result. [Citation.]

> In practice, the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make. But the trial court should not redecide the defendant's guilt in deciding whether to grant relief. [Citation.] Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial. [Citation.] Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶¶ 96-97.

At a third-stage evidentiary hearing, the burden is on the defendant to prove a claim of actual innocence by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92.

¶ 102    Here, the State does not dispute that Horton's testimony was material and noncumulative. But the parties disagree as to whether that testimony was new and would probably change the result on retrial.

¶ 103    As a preliminary matter, defendant asserts that the trial court "misunderstood *** the reasonably probable prejudice standard" that applies at a third-stage postconviction hearing. Defendant proposes that the court improperly made its own "definitive ruling" as to Horton's credibility as a witness, rather than considering how a jury would view Horton's testimony in light

of the trial evidence. We discern no indication that the court applied an improper standard. In its order, the court confirmed that it reviewed the "entirety of the evidence, file, pleadings, appellate history and arguments." The court then discussed the credibility of the witnesses who testified at the postconviction hearing and determined that the "ultimate outcome would not be different" on retrial with the addition of Horton's testimony. That is exactly the type of predictive determination that courts must make at third-stage evidentiary hearings on actual innocence claims. See *House*, 2023 IL App (4th) 220891, ¶ 94 (recognizing that it is for the trial court to "determine whether the new evidence is compelling enough to place the trial evidence in a new light and undermine confidence in the finding of guilt").

¶ 104       Turning to the merits of defendant's claim, defendant maintains that the Third District's decision in his last appeal became the law of the case as to whether Horton's testimony could have been discovered earlier through the exercise of due diligence. We reject defendant's argument. In resolving the prior appeal, the court considered whether defendant sufficiently alleged an actual innocence claim, which is entirely different from whether he proved his claim. The law of the case doctrine does not apply. See *People v. Shipp*, 2020 IL App (2d) 190027, ¶¶ 33-34 (holding that the appellate court's analysis of a claim in a prior appeal involving the first stage of postconviction proceedings did not become the law of the case for purposes of a third-stage hearing).

¶ 105       The record supports a conclusion that the evidence was not new, as defendant could have discovered Horton's testimony before trial by exercising reasonable diligence. Defendant admitted at the evidentiary hearing that (1) he was close friends with Horton before the morning of the shooting, (2) he was with Horton at the nightclub on the morning of the shooting, and (3) he provided Horton's name to the police in 2005. Although defendant testified that he did not know

Horton witnessed the shooting, defendant was vague about his efforts to ascertain before trial whether Horton had relevant information. Defendant testified only that he was unable to contact Horton through unspecified friends. Defendant provided no evidence that it would have been difficult to locate Horton, who lived in Chicago, had defendant spoken with his attorney about the issue before trial. There was also no evidence that Horton would have been reluctant to share his story had the defense contacted him earlier.

¶ 106 Even if Horton's testimony could be deemed newly discovered, the record reasonably supports the conclusion that Horton's testimony was not so conclusive that it would probably change the result on retrial. Defendant emphasizes the weakness in the State's trial evidence. He notes there was no physical evidence tying him to the shooting and that he made no inculpatory statements. Defendant also discusses various reasons why a factfinder might not accept Jordan's identification of him as the shooter. For example, defendant mentions that (1) there was evidence at trial suggesting that Jordan was intoxicated on the morning of the shooting; (2) Jordan initially told the police that she did not argue with McLain and then leave the Underground Nightclub before returning, whereas she testified at trial that those things happened; and (3) Jordan told the police that the shooter went up to McLain, put a gun on his chest, and shot him, whereas she testified at trial that the shooter reached around her to shoot. Defendant also discusses problems with Cox's identification of him as the shooter. Specifically, defendant notes that Jordan testified that she did not see Cox's vehicle at the entrance to Niagara Alley before the shooting. Cox also initially told the police that he had no relevant information about the shooting but later changed his story in hopes of obtaining leniency in his own federal drug case.

¶ 107 These were all points that defense counsel highlighted during his closing argument at trial, yet the jury found defendant guilty. When ruling on defendant's postconviction petition,

the trial court characterized the trial evidence against defendant as "overwhelming." Although that is a bit of an overstatement, it is important that Jordan—who witnessed her fiancé's murder at close range and had no incentive to implicate anyone falsely—confidently identified defendant as the shooter twice to the police and again in court. Jordan was positive about her identification, insisting that she will never forget defendant's face until the day she dies. To be sure, the trial evidence showed that Cox was a convicted felon who plainly wanted to obtain a benefit in his own case by testifying. With that said, Cox corroborated important aspects of Jordan's testimony, and there was no indication in the evidence as to how he would have learned those details unless he witnessed the events preceding the shooting. Tucker, who worked in a nearby parking garage, saw an SUV pull partially into the alley and then leave before the shooting, which likewise could be interpreted as corroborating Cox's testimony. Meanwhile, defendant testified that the shooter was someone known to him as Adrian, but other evidence showed that this person bore no physical resemblance to the person Jordan described as the shooter. Defendant was also impeached at trial with prior inconsistent statements he made to the police on matters that went to the heart of his defense. Ultimately, even if Jordan drank more on the morning of the shooting than she admitted, it is unlikely that she would confuse a man who was three inches shorter than she was and who had braided hair down to his shoulders with a bald man who was four inches taller than she was. The State's trial evidence was strong, even if not overwhelming. See *House*, 2023 IL App (4th) 220891, ¶ 133 ("Even if we disagreed with the trial court's characterization of the evidence as 'overwhelming,' the trial evidence, when considered with the third-stage postconviction evidence, was certainly strong enough for us to conclude that the court's ultimate decision was not manifestly erroneous.").

¶ 108    Horton's testimony at the postconviction hearing would be extremely unlikely to

- 28 -

change a jury's assessment of the trial evidence. Notably, Horton was a friend of defendant's before the shooting, and they reconnected in prison and discussed defendant's case before Horton produced his affidavit. When testifying at the hearing on defendant's postconviction petition, Horton could not remember the names of the nightclub or the alley where the shooting occurred, even though he had included that information in his affidavit. Horton also could not remember the time the shooting occurred (he testified that he left the nightclub around 2 or 3 a.m., whereas the trial evidence showed the shooting occurred after 4 a.m.).

¶ 109 Most importantly, Horton thoroughly undermined his own credibility by contradicting the facts outlined in his affidavit on critical points. Horton stated in his affidavit that he hung out with defendant and Adrian on the night of the shooting until around 4:20 a.m. According to Horton, at that point, Adrian and defendant went to defendant's car while Horton waited in Niagara Alley by the entrance to the Underground Nightclub. Horton averred that he then saw Adrian driving a car with defendant in the passenger's seat. Horton claimed he saw Adrian get out of the car, shoot McLain, and then drive past Horton. Horton then ran to his own car, went to Decatur, and moved to Chicago a little while later. Horton insisted that he knew defendant was not the shooter because he was standing in the middle of the alley with other people when the shooting occurred.

¶ 110 In stark contrast to what he outlined in his affidavit, Horton testified at the evidentiary hearing that he was a passenger in a car driven by a woman he knew as Neenee when the shooting occurred. Horton also testified that he did *not* see defendant in the car that Adrian drove into the alley. Additionally, rather than running to his own car, Horton testified that he left the alley in Neenee's car. Contrary to what defendant asserts on appeal, these were not merely "minor faults" in Horton's testimony, nor did such inconsistencies pertain to points that were

"irrelevant or easily explainable." Horton simply could not get his story straight about events he supposedly experienced and witnessed.

¶ 111　　　In ruling on the postconviction petition, the trial court was also entitled to consider that Horton testified that Adrian was five feet, six inches or five feet, seven inches tall, whereas jail records showed Adrian was six feet, three inches tall. One might expect Horton to have at least some sense of approximately how tall Adrian was, considering that they were purportedly acquaintances and hung out together on the night of the shooting.

¶ 112　　　Under the circumstances, the trial court reasonably declined to order a new trial based on defendant's actual innocence claim. Horton's testimony, when considered along with the trial evidence, was not so conclusive that it would probably change the result on retrial. To that end, Horton's testimony did not place the evidence presented at trial in a different light and undercut confidence in the factual correctness of the guilty verdict. Thus, the court's decision was not manifestly erroneous.

¶ 113　　　B. Whether Defendant Received Reasonable Assistance of Postconviction
　　　　　　　Counsel in Connection With His Ineffective Assistance Claims

¶ 114　　　Defendant also maintains that he received unreasonable assistance of postconviction counsel in connection with his ineffective assistance claims, which the trial court determined were untimely at the second stage of proceedings.

¶ 115　　　A postconviction petitioner is entitled to "reasonable assistance" of counsel at the second stage of proceedings, which is " 'significantly lower than the [standard] mandated at trial by our state and federal constitutions.' " *People v. Smith*, 2022 IL 126940, ¶ 35 (quoting *People v. Custer*, 2019 IL 123339, ¶ 30). Generally, the metric for evaluating whether postconviction counsel provided reasonable assistance is whether counsel complied with the requirements of Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). See *People v. Addison*, 2023 IL 127119,

¶¶ 19-20 (noting that Rule 651(c) ensures that postconviction petitioners receive reasonable assistance of counsel). That rule provides, in relevant part:

"The record filed in [the appellate court] shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

To provide reasonable assistance, an attorney must shape a defendant's *pro se* complaints into proper legal form and present them to the court. *Addison*, 2023 IL 127119, ¶ 19. That includes amending an untimely *pro se* petition "to allege any available facts showing the delay in filing was not due to the petitioner's culpable negligence in an effort to excuse the untimely filing." *People v. Perkins*, 229 Ill. 2d 34, 37 (2007).

¶ 116    If counsel files a valid Rule 651(c) certificate, a presumption arises that counsel provided reasonable assistance, and the defendant bears the burden of rebutting that presumption. *Addison*, 2023 IL 127119, ¶ 21. A valid certificate is one that substantially complies with Rule 651(c), even if it does not mirror the rule's language, such that a reviewing court may reasonably infer that counsel attested to fulfilling his or her duties. See *People v. Landa*, 2020 IL App (1st) 170851, ¶¶ 48-49. However, if counsel does not file any Rule 651(c) certificate, or if the certificate that counsel files does not substantially comply with the rule, no presumption arises, and the question for the reviewing court is whether the record shows that counsel complied with the duties outlined in the rule. See *People v. Johnson*, 154 Ill. 2d 227, 238 (1993) ("Although this court has

held that compliance with the duties set out in Rule 651(c) is mandatory, the absence of counsel's affidavit will be excused where the record demonstrates that counsel adequately fulfilled his duties as post-conviction counsel.").

¶ 117    Regardless of whether the presumption applies in a given case, if the reviewing court determines that counsel did not fulfill the duties outlined in Rule 651(c), the court may not employ a harmless-error analysis by considering the merits of the defendant's postconviction claims. *Addison*, 2023 IL 127119, ¶¶ 33-34. Rather, the court must simply remand for compliance with the rule. *Addison*, 2023 IL 127119, ¶¶ 33-34; see *People v. Suarez*, 224 Ill. 2d 37, 51 (2007) ("Our Rule 651(c) analysis has been driven, not by whether a particular defendant's claim is potentially meritorious, but by the conviction that where postconviction counsel does not adequately complete the duties mandated by the rule, the limited right to counsel conferred by the [Post-Conviction Hearing] Act cannot be fully realized.").

¶ 118    We review *de novo* whether an attorney complied with Rule 651(c). *People v. Wallace*, 2016 IL App (1st) 142758, ¶ 25.

¶ 119    1. *Whether the Presumption of Reasonable Assistance Arises*

¶ 120    As a threshold issue, the parties dispute whether the certificate that counsel filed substantially complied with Rule 651(c), thus giving rise to a presumption that counsel provided reasonable assistance. Again, the certificate that counsel filed stated:

> "1. I have been retained to represent [defendant] in his post-conviction petition.
>
> 2. I have reviewed the relevant orders, including but not limited to the order in 2022 IL App (3d) 200034-U.
>
> 3. I have reviewed the *pro-se* petition which was dismissed by the trial court

and was the subject of the above order.

4. I have read and reviewed the lengthy transcripts provided by [defendant.]

5. I have consulted with the [defendant] principally by letter on multiple occasions.

6. I have included in said petition all three fundamental claims of [defendant], and added a claim of conflict of interest."

On appeal, defendant argues that we should not interpret counsel's language in paragraph six as certifying that he "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The State, by contrast, argues that this certificate substantially complied with Rule 651(c).

¶ 121 The State's position prevails. In *Landa*, the court held that an attorney substantially complied with Rule 651(c) where he filed a supplemental postconviction petition along with a certificate asserting that he " 'communicated with the Petitioner by mail [and] telephonically and has examined the record and transcripts herein and has presented the Petitioner's claims.' " *Landa*, 2020 IL App (1st) 170851, ¶¶ 31, 49. We discern no meaningful difference between an attorney attesting that he " 'presented the Petitioner's claims' " (*Landa*, 2020 IL App (1st) 170851, ¶ 31) and an attorney attesting that he included the petitioner's "fundamental claims" and added another one. See *People v. Richardson*, 382 Ill. App. 3d 248, 257 (2008) (finding a certificate sufficient where counsel averred that she prepared a supplemental petition " 'augmenting' " and " 'adequately complement[ing]' " the original *pro se* petition).

¶ 122 In his reply brief, defendant cites *People v. Bashaw*, 361 Ill. App. 3d 963 (2005). In that case, counsel attested in a certificate that the " 'petitioner has indicated that he wishes to rely on his original post conviction petition.' " (Emphasis omitted.) *Bashaw*, 361 Ill. App. 3d at

967. The reviewing court found that this was "not an appropriate substitute" for Rule 651(c)'s requirement to certify that counsel made necessary amendments to present the petitioner's contentions. *Bashaw*, 361 Ill. App. 3d at 969. The court reasoned that an attorney must exercise his or her professional judgment about whether to amend a *pro se* petition, rather than just "surrender[ing] the decision to the defendant." *Bashaw*, 361 Ill. App. 3d at 969.

¶ 123    However, *Bashaw* is distinguishable, as postconviction counsel here amended defendant's postconviction petition and there is no indication that counsel inappropriately surrendered his duties to defendant. Counsel filed a certificate that substantially complied with Rule 651(c), so we presume that defendant received reasonable assistance.

¶ 124        2. *Whether Defendant Has Rebutted the Presumption*

¶ 125    The next question is whether defendant has rebutted the presumption that he received reasonable assistance of counsel.

¶ 126    Defendant argues that his postconviction counsel failed to comply with his duty to amend the petition to allege defendant's lack of culpable negligence for filing the initial petition more than nine years after the statutory deadline. Defendant emphasizes that he alleged his own lack of culpable negligence in his initial *pro se* petition, and those allegations were corroborated by documents in the record prepared in conjunction with the sentencing hearing. Analogizing the matter to *Addison*, defendant maintains that counsel made the *pro se* petition worse by amending it to remove allegations of a lack of culpable negligence, thereby rendering unreasonable assistance. See *Addison*, 2023 IL 127119, ¶ 24 (noting that an attorney "made the *pro se* petition worse by amending it" to remove allegations of ineffective assistance of appellate counsel, which were necessary to circumvent a procedural bar). Moreover, according to defendant, at the hearing on the postconviction petition, his counsel failed to respond to the State's arguments about the

- 34 -

petition being untimely and demonstrated ignorance of the law by confusing the concepts of forfeiture and lack of culpable negligence. Defendant also submits that his counsel should have performed an additional investigation, including (1) reviewing school and medical records that would have supported defendant's claim of illiteracy and (2) ascertaining whether prison lockdowns interfered with defendant filing his petition. Although defendant insists that we should remand the matter for further proceedings without considering the merits of his ineffective assistance claims, he nevertheless argues that his claim regarding the forgone plea offer appears to have merit.

¶ 127 The State expressly "acknowledges that defendant's amended petition does not included [*sic*] any information attempting to excuse defendant's inability to bring his claims at an earlier point in time." The State also concedes that "post-conviction counsel did not make any arguments at the evidentiary hearing attempting to help certain of defendant's claims avoid timeliness bars." Nevertheless, the State maintains there is no information in the record supporting a meritorious argument that defendant lacked culpable negligence for the lengthy delay in filing the petition. The State emphasizes the difficulty of establishing a claim of lack of culpable negligence, even where a defendant claims that he is mentally ill or illiterate. The State also submits that defendant demonstrated his own capabilities when he filed a *pro se* motion for an extension of the deadline to file a postconviction petition in 2010 and litigated a *pro se* section 2-1401 petition in 2018.

¶ 128 In his reply brief, defendant argues that the State is misguided in asking this court "to consider the merits *** of what post-conviction counsel omitted in order to determine whether counsel provided reasonable assistance, which is inconsistent with Illinois Supreme Court case law." Defendant submits that the State is essentially inviting us "to apply a harmless error

standard," which is impermissible.

¶ 129     We hold that defendant has not rebutted the presumption that postconviction counsel provided reasonable assistance. The record contradicts a fundamental premise of defendant's argument—that his counsel removed the allegations regarding lack of culpable negligence that defendant had alleged in his initial *pro se* postconviction petition. The parties both overlook that in the second amended petition, counsel indicated that defendant "includes herein as though set forth verbatim, paragraph A of his *pro se* petition, regarding the historical facts of the proceedings starting with the jury verdict." In paragraph A.8 of his *pro se* petition, defendant had alleged that he exhibited "due diligence" in filing the petition. In paragraph A.9, defendant then explained:

> "Reason for the late post-conviction petition is because of the petitioner's illiteracy not only to the law but as well as his education. He never past [*sic*] the 8th grade. He eventually was past [*sic*] on due to his age being to [*sic*] old to be in the 8th grade. His entire time in school he was in special education classes. He was medicated as a child to try and assist with his learning disability and behavioral disorder. During his incarceration he scored a 4.6, 3.6, and a 10.6 on his pre-GED tests, which was very low scores. In his defense, he did file a motion for continuance before his post-conviction deadline was up. Which should show that the defendant was not being neglectful but did not know how to read or write that well at that time. It took almost 10 years to not only learn the law and what his constitutional rights were. He practiced due diligence to figure out how to properly file a post-conviction petition and how to use case laws properly. The defendant just received some 'newly discovered evidence', to go with this actual innocence claim.

If Defendant had filed earlier, he would not have had the new evidence in this case. For these reasons is why the defendant is late to file. Defendant was not trying to be neglectful in any way."

¶ 130 Moreover, counsel wrote in the second amended petition that defendant submitted the affidavits and exhibits that were previously submitted with the initial *pro se* petition. Those documents included (1) defendant's August 9, 2010, motion for an extension of time to file his postconviction petition, in which defendant alleged that his prison was on lockdown for five out of the last seven months and that defendant could not read, write, or spell well; (2) a letter that defendant wrote to the clerk of the circuit court in March 2019 inquiring about the status of his August 2010 motion; (3) the clerk's response to that letter, indicating that the 2010 motion had been filed but never docketed or ruled upon; and (4) an affidavit in which defendant explained that he was on "Rittlen and Ataraul [*sic*]" as a child, only passed the eighth grade because he aged out, was in special education classes throughout his schooling, and had a learning disability and a behavioral disorder.

¶ 131 Thus, unlike in *Addison*, postconviction counsel did not make the petition worse by removing allegations that potentially could have circumvented a procedural bar. Rather, by incorporating defendant's *pro se* exhibits and affidavits and portions of the initial petition, counsel ensured that the trial court had before it the information relevant to defendant's claim that he lacked culpable negligence. Presumably, this is why counsel phrased his Rule 651(c) certificate as he did, certifying that he had included defendant's "fundamental claims."

¶ 132 We recognize that postconviction counsel did not file a response to the State's motion to dismiss the ineffective assistance claims as untimely. However, the parties agreed that the trial court would address all the issues at the same time as a third-stage evidentiary hearing on

the petition. Counsel did not expressly argue at the hearing on the petition that defendant lacked culpable negligence for the more than nine-year delay in filing the initial *pro se* petition. With that said, counsel elicited testimony from defendant that he sought an extension of time to file his petition in 2010 and that no action was taken on that motion. The obvious purpose of introducing that evidence was to remind the trial court of one of the reasons why defendant believed he lacked culpable negligence for filing the initial *pro se* petition late.

¶ 133    On appeal, defendant maintains that his postconviction counsel showed his ignorance of the law during his argument at the hearing when he confused the concepts of culpable negligence and forfeiture. Defendant also asserts that his counsel "did not understand that he had to show a lack of culpable negligence to excuse untimeliness, or what that even meant, in the first place." The record does not justify this harsh criticism. Counsel evidently knew that defendant had to establish a lack of culpable negligence, as counsel incorporated into the second amended petition the original petition's allegations on that issue. Additionally, when counsel mentioned waiver in his rebuttal argument at the hearing, he was responding to the assistant state's attorney's assertion that defendant's claim regarding the forgone plea offer was "legally forfeited" and "legally barred" because defendant was aware of that claim before his direct appeal.

¶ 134    Defendant also insists that his postconviction counsel should have conducted further investigation to support a claim that defendant lacked culpable negligence for the delay in filing the initial *pro se* petition. However, because counsel filed a certificate that substantially complied with Rule 651(c), we presume that counsel provided reasonable assistance. Defendant is flipping the presumption on its head by suggesting that counsel did not investigate relevant matters.

¶ 135    Under the totality of the circumstances, we cannot say that defendant has rebutted the presumption that his counsel provided reasonable assistance by complying with his duties

under Rule 651(c). Having so held, we need not address the parties' dispute about whether it would be appropriate for us to consider the merits of defendant's claim that he lacked culpable negligence for the nine-year delay in filing the petition. We note that defendant has made it clear that he does not want us to consider the merits of that claim as part of assessing whether he received reasonable assistance.

¶ 136                          C. Defendant's Alternative Request

¶ 137          Alternatively, defendant asks us to invoke our authority under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967) to remand the matter for further postconviction proceedings because the record is not conducive to evaluating whether postconviction counsel provided reasonable assistance. In support of this request, defendant relies on *People v. Carson*, 2024 IL App (1st) 221644, and *People v. Jackson*, 2021 IL App (1st) 190263.

¶ 138          In *Jackson*, the defendant's postconviction claim centered around his trial counsel's failure to introduce into evidence the clothes that the defendant wore on the night of his arrest. *Jackson*, 2021 IL App (1st) 190263, ¶ 21. At the second stage of proceedings, the trial court dismissed the petition because the defendant had not shown that the clothing still existed at the time of trial and would have been available to defendant's trial counsel. *Jackson*, 2021 IL App (1st) 190263, ¶ 26. On appeal, the defendant argued that his postconviction counsel provided unreasonable assistance. *Jackson*, 2021 IL App (1st) 190263, ¶ 40. The appellate court determined that the record was not conducive to evaluating this claim, as the record "lacks any indication, one way or the other," about postconviction counsel's efforts to locate the clothing and ascertain whether the clothing would have been available to trial counsel. *Jackson*, 2021 IL App (1st) 190263, ¶ 44. Under those circumstances, the court exercised its authority under Rule 615(b) to vacate the dismissal order and remand for further second-stage proceedings, during which

- 39 -

postconviction counsel could "further amend and support the petition" to address the deficiencies in the record. *Jackson*, 2021 IL App (1st) 190263, ¶ 46.

¶ 139       In *Carson*, the appellate court determined that the record was insufficient to evaluate whether postconviction counsel provided reasonable assistance, as there was no indication as to whether counsel reviewed the defendant's previously filed *pro se* section 2-1401 petition, which contained additional facts that were relevant to assessing whether the defendant lacked culpable negligence for filing his postconviction petition late. *Carson*, 2024 IL App (1st) 221644, ¶ 20. Following the lead of *Jackson*, the court remanded the matter for further second-stage proceedings while declining to address the merits of the defendant's claim that he lacked culpable negligence. *Carson*, 2024 IL App (1st) 221644, ¶¶ 24-25.

¶ 140       We note that another panel of the First District has opined that "*Jackson* was wrongly decided for several reasons." *People v. Turner*, 2023 IL App (1st) 191503, ¶ 51. We need not address that issue, as both *Jackson* and *Carson* are distinguishable. Here, counsel incorporated all of defendant's *pro se* allegations relating to a lack of culpable negligence. Thus, the record on appeal is conducive to evaluating (and rejecting) defendant's claim that he received unreasonable assistance of postconviction counsel.

¶ 141                              III. CONCLUSION

¶ 142       For the reasons stated, we affirm the trial court's judgment.

¶ 143       Affirmed.